**GENOVA BURNS LLC**
Matthew Baker, Esq. (NJ Bar #053092013)
mbaker@genovaburns.com
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 533-1112
*Attorneys for Plaintiff, ADP, Inc.*

**MCDONALD HOPKINS PLC**
James J. Boutrous, Esq. (MI Bar #P53710)
jboutrous@mcdonaldhopkins.com
39533 Woodward Avenue, Suite 318
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-7075
*Co-Counsel for Plaintiff, ADP, Inc.*
(*Pro Hac Vice* application forthcoming)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| ADP, INC., | : |
|  | : |
|  | : CIVIL ACTION NO. _____ |
| Plaintiff, | : |
| v. | : |
|  | : |
| KRISTEN APPLEMAN | : |
|  | : |
| Defendant. | : |
|  | : |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiff ADP, Inc. ("ADP"), for its Complaint for Injunctive and Other Relief

against Defendant Kristen Appleman ("Appleman"), states as follows:

34540973.3
34540973.8

## INTRODUCTION

1.    This action arises out of Appleman's breach of her contractual obligations to ADP contained in a number of agreements, including a Nondisclosure Agreement ("NDA") dated February 28, 2011 (attached as **Exhibit A**) and Restrictive Covenant Agreements ("RCAs") dated September 2, 2014, September 1, 2015, September 1, 2016, September 1, 2017, September 1, 2018, September 1, 2019, September 1, 2020, September 1, 2021, July 8, 2022, September 1, 2022 (2014 RCA attached as **Exhibit B**) and September 1, 2023 ("2023 RCA") (attached as **Exhibit C**) (NDA, RCAs, and 2023 RCA are together the "Agreements"). Specifically, after separating from employment with ADP, Appleman, a former ADP TotalSource Senior Vice President/General Manager, became employed by CoAdvantage Corporation ("CoAdvantage") – a direct competitor of ADP.

2.    By way of this action, ADP seeks to enforce the Agreements and in turn stop Appleman from further violating her Agreements and/or inevitably misappropriating ADP's confidential and proprietary information in her new role.

## JURISDICTION AND PARTIES

3.    ADP is a Delaware corporation with its principal place of business in Roseland, New Jersey.

4.    Upon information and belief, Appleman resides in or around the Atlanta, Georgia, Metropolitan Area.

2

5.     The Court has personal jurisdiction over Appleman because Appleman specifically consented in the Agreements that any action by ADP to enforce the Agreements, or any litigation related to those Agreements, may be brought in the State or Federal Courts located in the State of New Jersey. Appleman further agreed and consented to the personal jurisdiction of and venue in the State and Federal Courts of New Jersey for resolution of any litigation arising under or in connection with the Agreements. (*See* **Exhibit A**, ¶ 9; **Exhibit B**, ¶¶ 9-10; and **Exhibit C**, ¶ 13).

6.     Subject matter jurisdiction is appropriate in this matter pursuant to 28 U.S.C. § 1332(a)(1). ADP is a Delaware corporation, with its principal place of business in Roseland, New Jersey. For jurisdictional purposes ADP is a citizen of both New Jersey and Delaware. Appleman is a citizen of Georgia. Further, the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because the value of the confidential, proprietary, and/or trade secret information which Appleman will inevitably divert exceeds that amount and because, per the Agreements, ADP is entitled to recover its attorneys' fees incurred to enforce the Agreements. (*See* **Exhibit C**, ¶ 15).   Further, as elaborated upon below, the consideration Appleman received at the time of her departure from ADP in a Letter Agreement and Release ("Letter Agreement") (**Exhibit D**), and which she has materially breached per the violations alleged in this Complaint, well exceeds $75,000, exclusive of interest and costs.

3

7.     The Court also possesses supplemental jurisdiction over the state law claims stated herein.

## **FACTUAL BACKGROUND AND COMMON ALLEGATIONS**

8.     For over seventy years, ADP has provided business outsourcing and software services to clients, including human resources, payroll, tax, and benefits administration services. ADP offers its services internationally and across the United States.

9.     ADP's success in the industry is largely attributable to its confidential and proprietary information regarding, among other things, its proprietary products, software, services, techniques, strategic business plans, client and prospect lists, client preferences, pricing and contract details, operational procedures, marketing and sales strategies, and referral sources. ADP has invested significant time, money, and resources to generate, develop, and maintain its confidential and proprietary information.

## **Appleman's Employment with ADP**

10.     Appleman first commenced employment with ADP in April of 2011 as a Vice President of Client Service.

11.     Appleman received a series of promotions throughout her employment with ADP, including to Market General Manager, Vice President Health & Wealth, and then Senior Vice President Health & Wealth in September 2020.

4

12.    In July of 2023, ADP promoted Appleman yet again to ADP TotalSource Senior Vice President/General Manager ("SVP/GM"), and she remained in that role until her separation from employment.

13.    ADP provided Appleman with a significant amount of information about ADP, its clients and prospective clients, and its products and services. That information includes such things as: the strengths and weaknesses of ADP's products and services; the manner in which ADP sells its products and services; the way ADP differentiates its products and services from its competitors; the relative advantages and disadvantages between ADP's products and services and those of its competitors; ADP's pricing models and costs; ADP's underwriting and benefits acceptance processes; ADP's strategic planning documents; complaints made by ADP's customers; client and prospective client contact information; details and insights regarding clients/prospective clients that are used by ADP to cultivate and maintain business relationships; ADP's vendor relationships; and information that clients/prospective clients have given to ADP with the understanding that said information would be kept confidential by ADP.

14.    The information is confidential to ADP and should never be disclosed or used by a former employee who goes to a competitor.

## **Appleman's Agreements with ADP**

15.    New ADP associates enter into a nondisclosure agreement that provides ADP protection before the new associate is exposed to ADP's confidential business information or ADP's current or prospective customers.

16.    Appleman entered into the NDA on February 28, 2011. *See* **Exhibit A**. The NDA contains certain restrictions designed to protect ADP's confidential business information and client goodwill, among other protectable business interests. The NDA includes non-disclosure, non-use, non-solicitation, and return of property provisions. Specifically, the non-disclosure and non-solicitation provisions provide the following in pertinent part:

> 1(a). During and at any time after my employment with Automatic Data Processing, Inc. and/or any of its divisions, subsidiaries and affiliates (collectively "ADP"), I shall not, except in connection with my duties as an ADP employee, on my behalf or on behalf of any other person, corporation, partnership or other entity whatsoever (each, a "Person"), access, use, or disclose to any Person any confidential information, trade secrets, or other proprietary information of ADP, its vendors, licensors, marketing partners, business partners, or clients (including, but not limited to, (i) ADP's business methods, procedures, pricing and marketing structure and strategy which are not publicly available and which I did not learn from a public source, (ii) ADP's source and object codes, computer screens, programs and forms, experimental or research work, methods, processes, formulas, or drawings, (iii) tile names, addresses and business activities of ADP's current, former and prospective clients, and (iv) the names, addresses, and personal information of ADP's and ADP's current, former, and prospective clients' employees), learned by me at any time during my employment with ADP (collectively, the "ADP Information").

> 1(b). Upon ceasing to be an ADP employee, I shall immediately return all documents and electronically stored information containing ADP Info1mation (including all copies thereof), whether or not such materials were prepared by ADP, me or another Person, and which are in my possession or over which I exercise any control.

* * *

3(a). During the period that I am an ADP employee, I shall not (except in connection with my duties as an ADP employee), on my behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person that is a client, bona fide prospective client, marketing partner or business partner of ADP to sell, market, license, lease or provide any software, product or service competitive or potentially competitive with any software, product or service sold, marketed, licensed, leased, provided or under development by ADP at any time during my employment.

3(b). During the period commencing on the date I cease to be an ADP employee for any reason whatsoever (such date, being the "Termination Date") and ending on the date that is twelve months thereafter, I shall not, on my behalf or on behalf of any other Person, directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person that was a client, bona fide prospective client, marketing partner or business partner of ADP before the Termination Date to sell, market, license, lease or provide any software, product or service competitive or potentially competitive with any software, product or service sold, marketed, licensed, leased, provided or under development by ADP during the two-year period prior to my Termination Date, provided that the restrictions set forth in this paragraph 3(b) shall only apply to clients, bona fide prospective clients, marketing partners or business partners of businesses of ADP with which I was involved.

(*See* **Exhibit A**, NDA at ¶¶ 1(a)-(b); 3(a)-(b)).

17.     The NDA also contains an acknowledgment clause in which Appleman agreed that her "violation of the foregoing covenants…will cause irreparable injury to ADP. ADP shall be entitled, in addition to any other rights and remedies it may have at law or in equity, to an injunction enjoining and restraining [Appleman] from performing, and continuing in the performance of, any such violation." (**Exhibit A**, Paragraph 6).

18.     ADP also offers restricted stock annually to certain senior management employees due to their access to highly confidential ADP business and customer information and in an effort to reward these senior management employees.

7

19.    On September 2, 2014, September 1, 2015, September 1, 2016, September 1, 2017, September 1, 2018, September 1, 2019, September 1, 2020, September 1, 2021, July 8, 2022, September 1, 2022, and most recently on September 1, 2023, ADP offered, and Appleman accepted, an award of restricted stock, and Appleman entered into the RCAs with ADP in exchange for the ADP restricted stock. In the RCAs, Appleman agreed to obligate herself to non-competition, non-solicitation, non-disclosure, and non-use restrictive covenants. (*See* **Exhibits B-C**, 2014 and 2023 RCAs, respectively).

20.    The 2023 RCA includes the following pertinent provisions:

**2.    Definitions.**

**a.    '"Business of ADP"** means the following businesses or services: (i) business outsourcing and human capital management solutions, including, without limitation, human resource, payroll, time, attendance and labor management, pre-employment, talent management, compliance and payment solutions, tax and benefits and retirement administration solutions and employment administration outsourcing solutions, which ADP provides globally; (ii) workers compensation, health insurance, and other insurance products and services, which ADP provides in the United States and Canada through its licensed insurance agencies, and consulting services relating to its business outsourcing and human capital management solutions; and (iii) data-driven business intelligence on issues in human capital management, employment, and workforce trends.

**b.    "Business or Referral Partners"** means any individual, corporation, limited liability company partners    hip, joint venture, association, or other entity, regardless of form, and their employees and agents, that is or has been in a commercial or business relationship with ADP (excluding Clients and Vendors), including, without limitation, (i) referral sources or partners, resellers, brokers, distributors, licensees ,

franchisees, and marketing partners, (ii) implementation, integration and development partners, (iii) co-investors and joint venture partners, and (iv) any other individual or entity whose products or services ADP purchases, acquires or licenses for use with, or redistribution to, a third party (including Clients). Business or Referral Partners under this Agreement are not limited to individuals or entities that have exclusive relationships and/or contractual relationships with ADP.

c.      **"Clients"** means any individual, corporation, limited liability company, partnership, joint venture, association, government or quasi-government entity, or other entity, regardless of form, and their employees or agents, for: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP within the one (1) year period prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; (iii) prospective Clients whom I have solicited, contacted, called upon, communicated with, or attempted to communicate with on behalf of ADP in connection with the Business of ADP within the two (2) year period prior to my voluntary or involuntary termination of employment, for any reason, with or without cause, from ADP; or (iv) about whom I have any Confidential Information or trade secret information.

d.      **"Competing Business"** means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as or similar to that part of the Business of ADP in which I have worked or to which I have been exposed during the last two years of my employment with ADP (regardless of whether I only worked for a particular segment of that part of the business- for example, a business segment based on the number of employees a Client has or a particular class of business using an ADP product or service).

e.      **"Confidential Information"** means information, or any compilation of information, known or possessed by me because of my employment at ADP that is created, compiled, received, or gathered by ADP or its agents and is related to the Business of ADP, that is valuable to ADP, and which ADP endeavors to protect from disclosure or use by its competitors and others who could benefit from its use, whether in

written, tangible, electronic or any other form or media. Assuming the foregoing criteria are met, Confidential Information includes, but is not limited to, information about: ADP's operations, products, business plans, market strategies, and services; research and development of ADP products and services; ADP's intellectual property and trade secrets; Creative Works, including all publications, products, applications, processes, and software in any stage of development; names and other listings of current or prospective Clients, Business or Referral Partners, and Vendors (including contact information that may be compiled in computer databases that are not owned or controlled by ADP such as address books, personal digital assistants, smart phones, cloud storage services, and social and business websites); proposals made to current or prospective Clients, Business or Referral Partners, and Vendors or other information contained in offers or proposals to such Clients, Business or Referral Partners, and Vendors; the terms of any arrangements or agreements with Clients, Business or Referral Partners, and Vendors, including the amounts paid for such services or how pricing was developed by ADP, the implementation of Client-specific projects, the identity of Business or Referral Partners and Vendors, and Business or Referral Partner and Vendor pricing information, the composition or description of future services that are or may be provided by ADP; ADP's financial, marketing, and sales information; technical expertise and know-how developed by ADP, including the unique manner in which ADP conducts its business; employee lists, employee capabilities, confidential personnel information, prospective employee information, and employee training information and practices; Personally Identifiable Information; and Protected Health Information. Confidential Information also includes any information disclosed to ADP by a third party (including, without limitation, current or prospective Clients, Business or Referral Partners, and Vendors) that ADP is obliged to treat as confidential. Confidential Information does not need to be marked in any way to identify it as Confidential Information and does not lose its status as Confidential Information because similar information may be so marked while other Confidential Information is not. This definition of Confidential Information excludes information that is or becomes known or generally available in the public domain through lawful means, other than through my act or failure to act. This definition of Confidential Information and the use of the term Confidential Information in this Agreement is not meant to limit ADP's rights under applicable trade

secrets laws, and ADP specifically reserves all of its rights under all applicable laws concerning trade secrets.

\*\*\*

**5.     Non-Competition.** I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason, with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, finance, be employed by or with, or participate in any manner with a Competing Business where I (i) will provide the same or similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use, disclose or disseminate ADP's Confidential Information or trade secrets. However, after the voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP that is listed on a national securities exchange.

**6.     Non-Solicitation of and Non-Interference with Clients and Business or Referral Partners.** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason, with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly:

**a.     Clients:** Solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from, any Client or prospective Client for the purpose of selling products or services that compete with the Business of ADP provided that (i) the Client or prospective Client is listed on any list of Clients or prospective Clients assigned to me within the two (2) year period prior to the termination of my employment with ADP; (ii) I have solicited or contacted the Client or prospective Client on behalf of ADP within the two (2) year period prior to the termination of my employment with ADP, or (iii) I have learned or been provided confidential, proprietary or trade secret information about the Client or prospective Client during my employment with ADP.

**b.      Business and Referral Partners:** Solicit, divert, appropriate, or accept any business or business lead from, or attempt to solicit, divert, appropriate, or accept any business or business lead from, any Business or Referral Partner provided that (i) the Business or Referral Partner is listed on any list of Business or Referral Partners assigned to me within the two (2) year period prior to the termination of my employment with ADP; (ii) I have solicited or contacted the Business or Referral Partner on behalf of ADP within the two (2) year period prior to the termination of my employment with ADP, or (iii) I have learned or been provided confidential, proprietary or trade secret information about the Business or Referral Partner during my employment with ADP.

**7.      Non-Solicitation of Employees.** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason, with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly hire, solicit, recruit, or encourage to leave ADP, any current employees of ADP, or hire, solicit, recruit, or contract with employees who terminate their employment with ADP within twelve (12) months following my termination date. This restriction prohibits me from hiring, soliciting, recruiting or contracting with individuals regardless of who initiates communication. This restriction only applies to ADP employees located within the United States of America.

\* \* \*

**9.      Non-Disclosure and Non-Use of Confidential Information and Trade Secrets.** During my employment, except as authorized and required to perform my duties for ADP, and after the voluntary or involuntary termination of my employment for any reason or, with or without cause, I will not access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or trade secrets or take any action causing, or fail to take any action necessary in order to prevent, any such information to lose its character or cease to qualify as Confidential Information or a trade secret. I agree to inquire with ADP if I have any questions about whether I am authorized or required to access, disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or whether particular information is Confidential Information or a trade secret before accessing, using or

34540973.8

disclosing such information. I also agree to immediately return to ADP all property and information belonging to ADP such as keys, credit cards, telephones, tools, equipment, computers, passwords, access codes, pin numbers, and electronic storage devices, as well as all originals, copies, or other physical embodiments of ADP's Confidential Information or trade secrets (regardless of whether it is in paper, electronic, or other form), including any such information in any programs, business forms, manuals, correspondence, files, databases, or on computer disks or any other storage medium, including but not limited to cloud storage, whether or not owned or controlled by me or ADP (e.g., social and business networking websites, web-based email servers, Notability, or cloud storage services), immediately upon termination of my employment or upon any earlier request by ADP, and I agree not to keep, access, disclose, use, reproduce, distribute, or otherwise disseminate any copies, electronic or otherwise, of any of the foregoing. I also understand that my obligations under this paragraph, as well as the other covenants in this Agreement, extend to my activities on the internet, including my use of social networking sites such as LinkedIn and Facebook.

Pursuant to 18 U.S.C. § 1833(b), and as set forth fully therein, notice is hereby given that an individual shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

I understand that nothing in this Agreement prohibits me from reporting possible violations of state or federal law or regulation to any governmental agency or entity or from communicating with any such agency or entity regarding the same or otherwise participate in any investigation or proceeding that may be conducted by any government

13

agency, including providing documents or other information, without notice to ADP. This Agreement does not limit my right to receive an award for information provided to any government agencies. I understand that nothing in this Agreement shall have the purpose or effect of concealing details related to a claim of discrimination, retaliation, or harassment.

I understand that nothing in this Agreement is intended to prohibit any non-supervisory employee's right to discuss wages, terms and conditions of employment, or other conduct protected by Section 7 of the National Labor Relations Act.

\* \* \*

**15.    Relief, Remedies, and Enforcement.** I acknowledge that ADP is engaged in a highly competitive business, and the covenants and restrictions contained in this Agreement, including the geographic and temporal restrictions, are reasonably designed to protect ADP's legitimate business interests, including ADP goodwill and client relations, Confidential Information and trade secrets, and the specialized skills and knowledge gained by me and ADP's other employees during our employment. I acknowledge and agree that a breach of any provision of this Agreement by me will cause serious and irreparable damage to ADP that will be difficult to quantify and for which a remedy at law for monetary damages alone may not be adequate. Accordingly, I agree that if ADP should bring an action to enforce its rights under this Agreement and ADP establishes that I have breached or threatened to breach any of my obligations under this Agreement, ADP shall be entitled, in addition to all remedies otherwise available in law or in equity, to a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining such breach or threatened breach in any court of competent jurisdiction without the necessity of posting a surety bond, as well as an equitable accounting of all profits or benefits arising out of any violation of this Agreement. I also agree that nothing in this Agreement shall be construed to prohibit ADP from pursuing any and all other legal or equitable remedies available to it for breach of any of the provisions of this Agreement, including the disgorgement of any profits, bonuses, commissions, or fees realized by me, any subsequent employers, any business owned or operated by me or to which I provide services, or

14

any of my agents, heirs, or assigns. I also agree that that the knowledge, skills, and abilities I possess at the time of commencement of my employment are sufficient to permit me to earn a livelihood satisfactory to me without violating any provision of paragraphs five (5) through eight (8) above, for example, by using such knowledge, skills, and abilities, or some of them, in the service of business that is not competitive with ADP. I further agree to pay any and all legal fees, including without limitation, all attorneys' fees, court costs, and any other related fees and/or costs incurred by ADP in enforcing this Agreement.

**16.    Tolling.** The restricted time periods in paragraphs five (5) through seven (7) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants.

* * *

**19.    Electronic Signature.** I agree that ADP may enforce this Agreement with a copy for which I have provided an electronic signature. I agree that my electronic signature, including my acceptance of this agreement via a website is a valid signature by me.

(*See* **Exhibit C**, 2023 RCA at ¶¶ 2(a)-(e), 5-7, 9, 15-16, and 19).

## Appleman's Wrongful Conduct

21.    Appleman's employment with ADP ended on or about July 22, 2024.

In conjunction with her departure, Appleman was provided a six-figure severance

amount in exchange for, among other things, a reaffirmation of the Agreements and

continuing obligations to ADP that are contained therein.  (*See* **Exhibit D**, Letter

Agreement and Release at ¶ 9(e) ["Letter Agreement"]).

22.     Despite Appleman's reasonable restrictions in the Agreements, and, in particular, the RCAs and the 2023 RCA, as well as her reaffirmation of same in the Letter Agreement in exchange for considerable post-employment consideration, Appleman brazenly emailed Senior Litigation Counsel at ADP on October 29, 2024 and announced that she was taking a position with a principal ADP competitor, CoAdvantage, as first its Senior Vice President of Service on October 30, 2024 and then as its Chief Operations Officer beginning January 1, 2025.  (*See* **Exhibit E,** Appleman Email, October 29, 2024).  This position at CoAdvantage is in complete violation of her reasonable and continuing non-compete obligation to ADP.  (*See* **Exhibit C,** 2023 RCA at ¶ 5 and **Exhibit D**, Letter Agreement at ¶ 9(e)).

23.     Indeed Appleman's LinkedIn Profile confirms her employment with ADP's competitor, CoAdvantage, in the Atlanta Metropolitan Area.  (*See* **Exhibit F**, LinkedIn-Created Resume, accessed November 25, 2024).

24.     CoAdvantage is a professional employer organization that specializes in "handling human resources" and operates as an "outsourcing partner to administer payroll, benefits, workers' compensation and core HR functions." ***Id.***

25.     In an effort to amicably resolve these issues, ADP sent Appleman a letter (through her counsel) reminding her of her reasonable and continuing obligations to ADP and to secure the return of its confidential business information that Appleman may have, and/or confirm its destruction and non-use. (*See* **Exhibit**

**G,** Reminder Letter to Appleman [via counsel], dated November 13, 2024). ADP reasonably requested that Appleman confirm, in writing, her understanding of these obligations. Her counsel's November 25, 2024 response, while making some representations as to Appleman's intent to honor certain post-employment covenants, failed entirely to address the blatant non-compete violation when Appelman took the CoAdvantage position.[1] Counsel for ADP addressed this point more specifically with Appleman's counsel in a November 26, 2024 follow-up email and asked for a response by December 3, 2024. (**Exhibit H,** ADP Counsel Email, dated November 26, 2024). However, to date, Appleman's counsel has not responded.

26. ADP also sent a copy of the letter to Nick Kapiotis, Chief Legal Officer for CoAdvantage. (*See* November 13, 2024 Letter to Kapiotis, **Exhibit I**). ADP followed up with Kapiotis after he failed to acknowledge the letter. (*See* November 21, 2024 E-mail Correspondence, **Exhibit J**). Kapiotis ultimately confirmed that he received the letter and that "CoAdvantage will respond once we have had the opportunity to review." *Id.* Finally, on December 6, 2024, ADP received a response from CoAdvantage. (CoAdvantage Response, **Exhibit K**).

---

[1] Counsel's November 25, 2024 correspondence was sent under the auspices of Fed. R. Evid. 408 so it is not attached here.

27.    In the response, Kapiotis maintains that Appleman's position at CoAdvantage will be different that the one she held with ADP TotalSource. *Id.*, pg. 2. That position is at direct odds with the facts here. That is, Appleman is currently serving as the Senior Vice President of Service at CoAdvantage, and at the time she left ADP, she was serving in virtually the identical role as ADP TotalSource's Senior Vice President/General Manager. Indeed, CoAdvantage per its marketing page promotes itself as "HR experts who work with small business owners as their outsourcing partner to administer payroll, benefits, workers' compensation, and core HR functions. Our integrated and flexible approach to personalized HR management enables us to provide top-level services across many industries in the small business community in all 50 states and allows owners and managers to refocus resources on growth and development." (CoAdvantage Marketing Webpage, **Exhibit L**). These are precisely the services provided by ADP TotalSource. *See* ¶ 8 *supra*.

28.    Further, per Appleman's own email to ADP (**Exhibit E**), she is currently in a role at CoAdvantage that is very similar to the executive role she held at ADP.

29.    Upon information and belief, Appleman is expected to become CoAdvantage's Chief Operating Officer. *Id.*

30.    Appleman's employment at CoAdvantage in these roles is expressly forbidden by her non-compete obligations as set forth in her Agreements and as

18

reaffirmed by her in the Letter Agreement. (*See* **Exhibit C,** 2023 RCA at ¶ 5 and **Exhibit D**, Letter Agreement at ¶ 9(e)).

31.    Upon information and belief, Appleman continues to have access to ADP files, emails, and documents containing ADP confidential and proprietary business information.

32.    Indeed, Appleman sent business information between her personal email address and her ADP email address. By way of example, see **Exhibits M-O**, Emails with ADP Confidential and Proprietary Business Information/Notes Attached**.**

## Irreparable Harm to ADP

33.    Appleman's conduct is unfairly harming ADP's business. The harm is irreparable.

34.    If Appleman's conduct is not enjoined, Appleman will continue to impermissibly and unfairly compete, and to inevitably disclose and use ADP's Confidential Information to ADP's competitive disadvantage.

35.    As a direct result of Appleman's actions and future actions, ADP has lost, and will continue to lose, the value of its confidential and proprietary information as well as information and materials created by ADP solely for the benefit of ADP's business. Such information was developed and maintained at great expense and effort on the part of ADP, has been properly protected through

reasonable measures such as the Agreements at issue here, and belongs to ADP. Any ADP confidential and proprietary information that Appleman diverted from ADP will unfairly aid Appleman in her employment with CoAdvantage, a direct competitor of ADP.

36.    Unless enjoined, Appleman will continue to breach the Agreements, the Letter Agreement, and her legal duties and obligations by working at CoAdvantage, inevitably disclosing ADP's Confidential Information, and inevitably misusing ADP's Confidential Information to her own benefit as well as the benefit of CoAdvantage, to the competitive disadvantage of ADP.

37.    If Appleman is not immediately barred from violating the Agreements and Letter Agreement, and from, upon information and belief, using and disclosing any of ADP's confidential and proprietary information in her possession, ADP will continue to suffer irreparable harm. ADP lacks an adequate remedy at law to address the harm that it is suffering as a result of Appleman's actions. Indeed, as noted above, Appleman agreed that any violation of the Agreements and Letter Agreement would irreparably harm ADP and therefore would entitle ADP to injunctive relief to prevent further damage to ADP. (*See* **Exhibit C**, ¶ 15; **Exhibit D**, ¶ 9(f)).

38.    Due to Appleman's inevitable disclosure of ADP's confidential and proprietary information, ADP is entitled to permanent injunctive relief barring Appleman from violating her nondisclosure obligations and from wrongfully using

and disclosing ADP's confidential and proprietary information, as set forth more fully below. ADP is also entitled to damages, including lost profits, interest, costs, and attorneys' fees.

39.    By ignoring and disavowing her obligations under the clear noncompetition covenants contained in the Agreements and Letter Agreement, including her brazen acts of seeking out executive-level employment with a direct competitor of ADP, Appleman's breaches of the Agreements and the Letter Agreement constitute the type of willful, fraudulent, and malicious conduct that warrant punitive damages.

## **Count I**
## **Breach of Contract – the Agreements**

40.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

41.    Appleman voluntarily entered into the Agreements with ADP.

42.    The Agreements are each valid, binding, and enforceable contracts.

43.    The Agreements are each supported by adequate legal consideration.

44.    ADP fully performed as required under the Agreements.

45.    Appleman blatantly breached the Agreements by engaging in the conduct described herein, including by working for a direct competitor of ADP and inevitably disclosing, using and otherwise misappropriating ADP's confidential, proprietary, and trade secret information.

34540973.8

46.    As a result of Appleman's breaches, ADP has suffered damages.

47.    As a result of Appleman's breaches, ADP has suffered irreparable injury, and ADP will continue to suffer irreparable injury for which there is no adequate remedy at law.

48.    ADP is entitled to any and all legal damages, costs, and disbursements incurred in this action, including but not limited to, lost profits, any and all compensation or benefits provided under the Agreements, inclusive of interest, costs and attorneys' fees, and to permanent injunctive relief against further breaches of the Agreements.

## Count II
### Breach of Contract – the Letter Agreement

49.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

50.    Appleman voluntarily entered into the Letter Agreement with ADP.

51.    The Letter Agreement is a valid, binding, and enforceable contract.

52.    The Letter Agreement is supported by adequate legal consideration.

53.    ADP fully performed as required under the Letter Agreement.

54.    Appleman blatantly breached the Letter Agreement by engaging in the conduct described herein, including by working for a direct competitor of ADP and inevitably disclosing, using and otherwise misappropriating ADP's confidential, proprietary, and trade secret information.

34540973.8

55.    As a result of Appleman's breaches, ADP has suffered damages.

56.    As a result of Appleman's breaches, ADP has suffered irreparable injury, and ADP will continue to suffer irreparable injury for which there is no adequate remedy at law.

57.    ADP is entitled to any and all legal damages, costs, and disbursements incurred in this action, including but not limited to, lost profits, any and all compensation or benefits provided under the Letter Agreement, inclusive of interest, costs and attorneys' fees, and to permanent injunctive relief against further breaches of the Letter Agreement.

## Count III
## Breach of the Duty of Loyalty

58.    The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

59.    As an employee of ADP, Appleman owed her employer an undivided duty of loyalty including, but not limited to, the duty to advance the interests of ADP, and the duty to not, either on her own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client or prospective Client for the purpose of selling products or services that compete with the Business of ADP.

60.     Following the end of her employment with ADP, Appleman continues to owe a duty to ADP.

61.     Appleman breached her duty of loyalty by wrongfully competing with ADP and by inevitably disclosing ADP's Confidential Information and trade secrets.

62.     Appleman's breaches of the Agreements and Letter Agreement have wrongfully benefitted both Appleman and CoAdvantage, which, in turn, have caused ADP to suffer damages.

63.     As a result of Appleman's breaches, ADP has suffered irreparable injury, and ADP will suffer further irreparable injury for which there is no adequate remedy at law.

64.     ADP is entitled to any and all legal damages, costs and permanent injunctive relief against further breaches of the Agreements and Letter Agreement by Appleman.

## Count IV
## Unfair Competition

65.     The preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

66.     Appleman's aforementioned unlawful behavior constitutes unfair competition.

67.     Appleman's conduct was undertaken with the intent to interfere with and disrupt ADP's business.

34540973.8

68.     Appleman's acts have resulted in and continue to result in Appleman's and CoAdvantage's wrongfully procured an unfair competitive advantage to the competitive disadvantage of ADP.

69.     Appleman's actions are intentional, malicious, and unjustified in law.

70.     As a proximate result of Appleman's actions and conduct amounting to unfair competition, ADP has been and will continue to be irreparably injured, including, but not limited to, the loss of its competitive edge, client goodwill, and Confidential Information.

71.     Unless permanently restrained, Appleman will continue to violate ADP's rights through her unfair competition. Accordingly, a permanent injunction restraining and enjoining Appleman from continuing her actions is the only remedy that will afford ADP meaningful relief.

72.     Due to Appleman's unfair competition, as well as a loss of ADP's competitive advantage and client goodwill, ADP is entitled to permanent injunctive relief as well as any and all legal damages, including, but not limited to, lost profits, any and all compensation or benefits provided under the Agreements and Letter Agreement, inclusive of interest, costs and attorneys' fees.

<u>**REQUESTS FOR RELIEF**</u>

**WHEREFORE**, ADP respectfully requests:

34540973.8

A.    That this Court enjoin Appleman from directly or indirectly undertaking the following activities:

      i.    Working or performing similar services for any competitor of ADP, including, without limitation, CoAdvantage, for a period of twelve (12) months from the date of entry of an Order granting ADP injunctive relief or for a period of twelve (12) months from April 4, 2025 as provided for in the Letter Agreement, ¶ 9(e), whichever is greater;

      ii.    Violating the terms and conditions of the Agreements or Letter Agreement with ADP;

      iii.    Using or disclosing at any time in the future, ADP's confidential, proprietary, or trade secret business information or property;

      iv.    Interfering in any way with any current contract, client relationship, prospective client relationship, or marketing partner relationship of ADP;

      v.    Directly or indirectly soliciting, contacting, calling upon, communicating with or attempting to communicate with any Person which was a client, bona fide prospective client, or marketing partner of ADP with which Appleman was involved or exposed during her employment; and

      vi.    Breaching any loyalty obligation to ADP, including, but not limited to, appropriating any business opportunity of ADP, engaging in deceptive acts or statements with regard to ADP's abilities, experiences, and personnel, and from otherwise attempting to gain unfair advantage against ADP;

B.    That Appleman be ordered to return all ADP confidential information and property to ADP, including, but not limited to, requests for proposal, requests for bid, client correspondence, meeting minutes, notes, marketing data, prospect meeting data, proposals, faxes, pricing contracts, contracts awarded, marketing

26

brochures, recommendations, including, but not limited to, vendor recommendations, marketing database, marketing plans, costs, client lists, prospect lists, marketing partner information, client contact information, prospect client contact information, competitive bid information, strategic planning information, alliance relationships, employee lists, client information, internal strengths and weakness information, marketing plans, business plans, project costs and all other confidential, proprietary or trade secret information, confidential client and vendor information and confidential and proprietary marketing partner information, in any form including electronic and hard copy form;

C.    That Appleman be restrained from destroying or disposing of any paper documents in her possession, custody or control, or deleting anything from any computers to which she has access, including smartphones, PDAs, or any other electronic storage devices, including e-mail, databases, and any other electronically stored data that relate to, evidence or concern any of the issues involved in this litigation and that Appleman immediately turn over all of the electronic devices in her possession, custody or control for non-destructive imaging to preserve the contents of these electronic devices; and

D.    That ADP be granted monetary damages, including, but not limited to, exemplary and punitive damages, lost profits, all legal damages and costs associated with Appleman breaching the Agreements and Letter Agreement, and all other

34540973.8

appropriate damages, as well as all interest, costs and disbursements of this action, including attorneys' fees, as contractually agreed upon, and such other and further relief and this Court may deem just and proper.

Dated this 6th day of December, 2024.

Respectfully submitted,

/s/    Matthew I. W. Baker
**GENOVA BURNS LLC**
Matthew Baker, Esq. (NJ Bar #053092013)
mbaker@genovaburns.com
494 Broad Street
Newark, New Jersey 07102
Telephone: (973) 533-0777
Facsimile: (973) 533-1112
*Attorneys for Plaintiff, ADP, Inc.*

**MCDONALD HOPKINS PLC**
James J. Boutrous, Esq. (MI Bar #P53710)
jboutrous@mcdonaldhopkins.com
39533 Woodward Avenue, Suite 318
Bloomfield Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-7075
*Co-Counsel for Plaintiff, ADP, Inc.*
(*Pro Hac Vice* application forthcoming)