<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

ADP, INC.,

      Plaintiff,

      v.

KRISTEN APPLEMAN,

      Defendant.

No. 24cv10967 (EP) (JSA)

**OPINION**

---

**PADIN, District Judge.**

    This matter comes before the Court by way of Plaintiff ADP, Inc.'s ("ADP") motion for a preliminary injunction against its former employee, Defendant Kristen Appleman ("Appleman"), for alleged breach of various restrictive covenants. D.E. 5 ("Motion" or "Mot."). The Court decides the Motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, the Court will **DENY** the Motion.

**I.    BACKGROUND**

    ADP provides business outsourcing and software services to clients. D.E. 1 ("Compl.") ¶ 8. Appleman first joined ADP in April 2011 as Vice President of Client Service, climbing the corporate ladder until being promoted to ADP TotalSource Senior Vice President/General Manager ("SVP/GM") in July 2023. *Id.* ¶ 12. She remained in that role until she left the company. *Id.* In the course of her employment, Appleman received information about ADP's current and prospective clients, its products and services, its pricing models, its strategy planning documents, and its vendor relationships. *Id.* ¶ 13.

    Appleman entered into a non-disclosure agreement on February 28, 2011, restricting her ability to disclose any "confidential information, trade secrets, or other proprietary information of

ADP . . . learned by [her] at any time during [her] employment with ADP." Compl., Ex. A ¶ 1(a) ("NDA"). The NDA also requires Appleman to "immediately return all documents and electronically stored information containing ADP Information" after separation from the company, *id.* ¶ 1(b), and contains a non-solicitation provision extending twelve months after her termination date, *id.* ¶ 3(b). Appleman also entered into Restrictive Covenant Agreements[1] upon acceptance of an award of restricted stock, which similarly contained non-compete, non-solicitation, and non-disclosure provisions. Compl., Exs. B ("2014 RCA"), C ("2023 RCA") (the "RCAs"). The RCAs define "Competing Business" as "any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of ADP for that part of the business in which I have worked or to which I have been exposed during my employment with ADP[.]" 2014 RCA ¶ 1(d); 2023 RCA ¶ 1(d).

Appleman left ADP on or about July 22, 2024 and entered into a release agreement that provided for a severance amount in exchange for a reaffirmation of the foregoing NDA and RCAs (together, the "Agreements"), Compl., Ex. D ("Letter Agreement"), which would terminate twelve months after April 4, 2025, *id.* ¶ 9(e). ADP avers that notwithstanding these various contractual obligations, Appleman informed ADP on October 29, 2024 that she was joining ADP competitor CoAdvantage as its Senior Vice President of Service on October 30, 2024 and then as Chief Operations Officer beginning January 1, 2025. Compl. ¶ 22. CoAdvantage administers payroll,

---

[1] Appleman entered into multiple other similar RCAs with ADP, but for sake of brevity, the Court uses two examples. *See* D.E. 5-4 ("Donohue Decl."), Exs. 1-19.

benefits, workers' compensation and other human resources functions. *Id.* ¶ 24. This professional move allegedly violates Appleman's non-compete obligations. *Id.* ¶ 22.

ADP reached out to Appleman through her counsel on November 13, 2024, *id.* ¶ 25, and corresponded with Appleman and CoAdvantage Chief Legal Officer Nick Kapiotis about its concerns, the latter of whom maintains that Appleman's position differs from the one she held at ADP, *id.* ¶¶ 25-27. ADP contends the positions are nearly identical and in addition to violating her non-competes, Appleman sent business information between her personal email address and her ADP email address. *Id.* ¶¶ 28, 32. It commenced this action on December 6, 2024.

ADP alleges breach of contract of the Agreements (Count I), breach of contract of the Letter Agreement (Count II), breach of the duty of loyalty (Count III), and unfair competition (Count IV). *Id.* ¶¶ 40-72. It also moves for a preliminary injunction to enjoin Appleman from working for CoAdvantage or any competitor for twelve months from April 4, 2025 and otherwise violating the terms of the various agreements entered into between her and ADP. Mot. Appleman opposes. D.E. 23 ("Opp'n").[2] ADP replies. D.E. 26 ("Reply").

## II.    LEGAL STANDARD

"Preliminary injunctions and TROs are extraordinary remedies that are not routinely granted." *Gentile v. Secs. and Exch. Comm'n*, No. 19-5155, 2019 WL 1091068, at *2 (D.N.J. Mar. 8, 2019) (citing *Kos Pharm., Inc. v. Andrx. Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). The decision to grant such relief is within the discretion of the district court. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

---

[2] Pursuant to this Court's Order, D.E. 22, Appleman re-filed her opposition brief. She did not re-file her declarations, but as the Court's Order only required re-submission of the overlength brief, the Court refers to the declarations annexed to the original filing at D.E. 21.

The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). To obtain a TRO or a preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . . If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179. A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (cleaned up); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate.").

## III.    ANALYSIS

### A.    Likelihood of Success

#### 1.    *Enforceability of the RCAs*

Appleman does not dispute that she entered into the RCAs but instead argues that they are unenforceable. Opp'n at 19. ADP counters that they are enforceable under New Jersey law. Mot.

at 27.[3]  Because the likelihood of ADP's success on the merits of its breach of contract claim cannot proceed without a threshold determination of the contracts' enforceability, the Court begins its analysis there.

"New Jersey has evolved from invalidating overbroad restrictive covenants outright to presumptively 'compress[ing] or reduc[ing]' their scope 'so as to render the covenants reasonable.'"  *ADP, LLC v. Rafferty*, 923 F.3d 113, 120 (3d Cir. 2019) (quoting *Karlin v. Weinberg*, 77 N.J. 408 (1978)).  "Known as partial enforcement or blue penciling, this rule favors granting 'that limited measure of relief within the terms of the noncompetitive agreement' that (1) protects a legitimate business interest, (2) does not unduly burden an employee, and (3) adheres to the public interest." *Id.* (quoting *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 585 (1970)).  At issue are Appleman's purported violations of her non-compete and non-disclosure obligations. Mot. at 24.[4]  The RCA's non-compete provision states:

> I agree that during my employment and for a period of twelve ( 12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use or disclose ADP's trade secrets.

2014 RCA ¶ 3; 2023 RCA ¶ 5.

---

[3] The Agreements call for application of New Jersey law.  *See* NDA ¶ 9; 2014 RCA ¶ 9; 2023 RCA ¶ 13.  Appleman does not dispute the application of New Jersey law.

[4] ADP states that Appleman is in violation of her non-solicitation obligations, but the Court fails to see any direct allegations that Appleman has improperly solicited ADP clients.  *See generally* Compl.  The allegations are confined to her employment with a purported direct competitor and possession of confidential information that she will "inevitably disclose."  Mot. at 20.

A Competing Business is defined as:

> [A]ny individual (including me), corporation, limited liability
> company, partnership, joint venture, association, or other entity,
> regardless of form, that is engaged in any business or enterprise that
> is the same as, or substantially the same as, the Business of ADP for
> that part of the business in which I have worked or to which I have
> been exposed during my employment with ADP (regardless of
> whether I worked only for a particular segment of that part of the
> business in which I worked- for example, business segments based
> on the number of employees a Client has or a particular class of
> business using an ADP product or service).

2014 RCA ¶ 1(d); 2023 RCA ¶ 2(d).

The Letter Agreement reaffirmed Appleman's preexisting obligations under the
Agreements, but expanded the length thereof:

> For purposes of this Letter Agreement, (i) the term "Restrictive
> Covenant" will mean any non-competition, non-disclosure and/or
> confidentiality obligations reflected in the provisions of any
> agreement with ADP that you have entered into, or any ADP plan,
> policy or arrangement that applies to you and (ii) any Non-
> Competition Period, as defined in any Restrictive Covenant, will
> terminate 12 months after **April 4, 2025**. In addition to and
> consistent with the covenants and promises set forth herein, you
> agree (i) to abide by all non-compete, non-solicitation, non-
> disclosure, confidentiality and/or works for hire obligations
> included in any Restrictive Covenant or other agreement(s) that you
> entered into during your employment with ADP, and (ii) that the
> validity of such agreements as they relate to any such obligations is
> unaffected by the terms and conditions of this Letter Agreement.

Letter Agreement ¶ 9(e) (emphasis in original).

### a.    *Legitimate business interest*

The New Jersey Supreme Court counsels balancing an employer's need to protect its
legitimate interests against hardships imposed on employees by a restrictive agreement. *ADP,
LLC v. Kusins*, 460 N.J. Super. 368, 401 (App. Div. 2019). "An employer's legitimate interests
include the protection of trade secrets or proprietary information, as well as customer
relationships" and the "protection of information that, while not a trade secret or proprietary, is

nonetheless 'highly specialized, current information not generally known in the industry, created and stimulated by the . . . environment furnished by the employer, to which the employee has been 'exposed' and 'enriched' solely due to his employment.'"  *Id.* (quoting *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 638 (1988)).  The simple prevention of competition is not a legitimate interest, and skills or expertise acquired by employees during employment may be used freely, including in competition with a former employer.  *Id.*

ADP points to various decisions upholding the legitimate business interests it has in maintaining client relationships.  Mot. at 28-29.  In *Rafferty*, the Third Circuit found ADP's ability to attract and retain clients a legitimate business interest "worthy of protection."  923 F.3d at 123.

In the district court cases on appeal in *Rafferty*, ADP put forth declarations explaining why certain employees received restricted stocks.  *Id.* at 119.  In *ADP v. Rafferty*, No. 18-1922, 2018 WL 1617705, at *118 (D.N.J. Apr. 3, 2018), ADP "[r]el[ied] on the sworn statement of an ADP executive" to argue that certain restrictions were designed "to protect 'the client relationships and the goodwill that sales associates will develop and help develop in the course of their job duties.'" *Id.* at 118.  In *ADP v. Mork*, No. 17-4613, 2018 WL 3085215, at *119 (D.N.J. June 22, 2018), ADP explained "that those who receive restricted stock 'have extensive contact with ADP clients because they sell the most ADP products and service[s] and are the most successful sales associates,' and 'maintain the closest personal relationships with the key contacts and personnel' of ADP's clients and prospects[.]'"  *Id.* at 119.  In turn, the Third Circuit found that ADP had a legitimate business interest in imposing the RCA on this subset of employees because it could "empirically measure which of its employees have more extensive client contact," and employees could "achieve this more extensive client contact in one of two ways—by virtue of selling to a

greater number of customers or by selling more products to a smaller number of customers." *Id.* at 123.

Similarly, in *ADP, LLC v. Pittman*, Judge McNulty relied in part on an ADP executive's declaration that ADP "requires new sales associates to sign the NDA because it wants to protect the confidential information that sales associates obtain in the course of their duties" and because it "hopes to protect the client relationships and goodwill that sales associates develop during their time at the company." No. 19-16237, 2019 WL 5304148, at *2 (D.N.J. Oct. 18, 2019). The declaration also explained that "sales employees who meet their sales targets are annually offered restricted stock in ADP" and "[t]he restricted stock is designed to be a reward to attract, retain, and motivate ADP employees and to strengthen the mutual interest between the employees and ADP." *Id.* at *3.

Appleman attempts to distinguish these cases by arguing that she had no direct book of business or revenue targets because she was not a salesperson, and therefore, ADP's only interest in entering the RCAs with her was to improperly restrain competition. Opp'n at 20.

Appleman extensively describes her work history at ADP. When she first joined ADP, she worked with ADP client business partners that "provided HR guidance and strategic planning support to small and mid-sized business owners." D.E. 21-1 ("Appleman Decl.") ¶ 10. She then oversaw HR services teams of HR business partners across various states. *Id.* ¶ 11. From 2016-2023, Appleman "managed the benefits service team handling day-to-day client support" and eventually oversaw "the benefit carrier strategy team interfacing with insurance carriers, external broker relationships, and the retirement services team overseeing the 401(k) Multiple Employer Plan." *Id.* ¶ 12. In her most elevated role as SVP/GM, she oversaw four regional general managers and managed implementation, payroll service, tax, and HR services. *Id.* ¶ 14.

ADP, for its part, provides no sworn declaration attesting to the business needs of the RCAs or why certain employees received restricted stock.  Instead, it cites to the Complaint's allegations only and argues that it "offers participation in a restricted stock, stock option, and restricted stock unit award program to certain senior management employees due to their access to highly confidential ADP business and customer information and in an effort to reward these senior management employees."  Mot. at 6 (citing Compl. ¶ 18).

ADP does provide a sworn declaration explaining what information Appleman was privy to in her various positions, namely:

> the strengths and weaknesses of ADP's products and services; the manner in which ADP sells its products and services; the way ADP differentiates its products and services from its competitors; the relative advantages and disadvantages between ADP's products and services and those of its competitors; ADP's pricing models and costs; client retention practices; ADP's underwriting and benefits acceptance processes; ADP's strategic planning documents; complaints made by ADP's customers; client and prospective client contact information; details and insights regarding clients/prospective clients that are used by ADP to cultivate and maintain business relationships; ADP's vendor relationships; and information that clients/prospective clients have given to ADP with the understanding that said information would be kept confidential by ADP.

D.E. 5-5 ¶ 10 ("Michaud Decl.").

In *Rafferty*, the Third Circuit did not "perceive a bright line rule that restrictive covenants are unenforceable restraints on trade if imposed selectively and as a second layer[.]"  923 F.3d at 124.  It held that "ADP's two-tiered system of binding only a subset of high-performing employees necessarily amounts to *less* of a restraint on trade than a single-tier system."  *Id.* at 125.[5]

---

[5] The Third Circuit also rejected the argument that voluntary participation in the stock awards shows that the primary purpose is to buy out potential competition.  *Id.* at 125.  This Court generally agrees, but unlike in *Rafferty*, ADP here did not provide "declarations of ADP's witnesses" that "it manifests a reasonable business judgment as to how to best balance its

While the Court agrees that a two-tiered system of restricted stock offering (and in turn, enforcement of RCAs) is less of a restraint on trade than a uniform application of such, there is no indication in this record that *these* restricted stocks were offered for any other reason than to hamper competition of higher-ranking employees, irrespective of their level of exposure to clients. It is very well possible that the RCAs were directed to employees in similar positions to Appleman because of the specific information they access; but ADP does not provide comparable requisite information indicating as much as in the cases it relies on. It explains what information Appleman had access to, D.E. 26-4 ¶¶ 5-12, including the extent of her interaction with clients. However, ADP does not meaningfully identify its "legitimate business interest in imposing the RCA restrictions on its best-performing employees" by setting "goals for its employees and identifying those who meet them," in turn "identify[ing] the employee-sources of the most client contact." *Pittman*, 2019 WL 5304148, at *15.

In sum, this case is not like those ADP relies on. Nonetheless, "it is now settled in the Third Circuit that ADP's RCA agreement serves a legitimate business interest under New Jersey law because it serves ADP's legitimate interest of protecting its client relationships against former employees" and because imposition of the RCAs "are reflective of the greater damage those employees could inflict on ADP upon their departure." *ADP, LLC v. Olson*, No. 20-3312, 2020 WL 6305554, at *9 (D.N.J. Oct. 28, 2020); *Rafferty*, 923 F.3d at 123. The Court is mindful of ADP's lack of proffered evidence of its legitimate business interests here as compared to in other cases. It also notes that employees' "countervailing interests" warrant "tailor[ing] the restrictions through the process of blue penciling[.]" *Rafferty*, 923 F.3d at 125.

---

employees' and the public's need for free competition with its own need to protect its legitimate business interests." *Id.*

b.      **Undue burden**

"Under New Jersey's *Solari* test, even where a covenant serves legitimate business interests, 'it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity' so that those interests are not outweighed by the hardship the covenant inflicts on the employee." *Pittman*, 2019 WL 5304148, at *15 (quoting *Coskey's Television & Radio Sales and Serv., Inc. v. Foti*, 253 N.J. Super 626, 635 (App. Div. 1992)).

ADP contends that a one-year, industry-focused non-competition obligation is reasonable. Mot. at 30.  Appleman rebuts that the industry restriction, geographical scope, and timespan of the non-compete are too broad.  Opp'n at 23-28.  The Court finds the provisions are likely reasonable.

The RCAs' non-compete provisions state that Appleman may not "directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed[.]"  2014 RCA ¶ 3.  Territory is defined as "the geographic area where I worked, represented ADP, or had Material Business Contact with ADP's Clients in the two (2) year period preceding the termination of my employment with ADP."  *Id.* ¶ 1(h).  A Competing Business is one that is the "same as, or substantially the same as, the Business of ADP for that part of the business in which I have worked or to which I have been exposed during my employment with ADP[.]"  *Id.* ¶ 1(d).   The Letter Agreement binds Appleman to preexisting restrictive covenants and mandates that they will terminate 12 months after April 4, 2025.  Letter Agreement ¶ 9(e).

*Rafferty* dealt with a nearly identical RCA, restricting the employee "from working 'in any manner with a Competing Business anywhere in the Territory where doing so will require [them]' to either 'provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed[.]'"  923 F.3d at 126.  Though more focused on

the broadness of the non-solicitation provision in that case, the Third Circuit remanded to the District Court because "the undue hardship factor . . . counsel[ed] in favor of blue penciling[.]" *Id.* at 126.

The RCA in *Pittman* was also nearly identical: it "provide[d] that for a one-year period after their departure from ADP, employees may not 'participate in any manner with a Competing Business' in the geographic area where the employee worked or had contact with ADP clients if working in that area would require the employee to 'provide the same or substantially similar services to a Competing Business as those which [they] provided to ADP while employed.'" 2019 WL 5304148, at \*15. Judge McNulty deferred to *Kusins*, "an on-point decision of the State's intermediate appellate court, because it is the most authoritative indicator of how the New Jersey Supreme Court would view the ADP agreements." *Id.* at \*16. There, the court found the scope of the non-compete reasonably tailored in accordance with this analysis, because the record demonstrated that the defendant's new employer was encompassed in her ADP territory. *Id.* at \*17.

Here, Appleman disputes the geographic limitation, terms of the restriction, and the duration. The Court will take each argument in turn.

As to geographic scope, "[w]hile the *Kusins* court did not discuss geography because the parties there conceded that point, the cases cited by *Kusins* on that issue, hold that it should correspond to the employee's territory while at ADP." *Id.* The Court adopts this position as well and does not find the geographic scope of the RCAs *per se* burdensome. Appleman worked for ADP in Georgia and appears to continue to work for CoAdvantage in Georgia, Compl., Ex. F, so there is no dispute as to the applicability of the "Territory" definition.[6] The Court also finds that

---

[6] The Court notes, however, that under different facts, ADP's argument could stretch too far.

the restriction, limiting work for a competing business providing the same or substantially similar services as provided to ADP, is not likely to be unduly burdensome. *See Olson*, 2020 WL 6305554, at *3, 9.

The duration is also likely reasonable. ADP maintains that Appleman is restricted from competing with ADP for "a period of one year from the date Appleman begins complying with her obligations under the Agreements." Mot. at 30. The Agreements bar Appleman from competing with ADP for twelve months after termination of her employment. 2014 RCA ¶ 3; 2023 RCA ¶ 5. However, ADP seeks to enjoin Appleman from "[w]orking or performing similar services for any competitor of ADP, including, without limitation, CoAdvantage, for a period of twelve (12) months from the date of entry of an Order granting ADP injunctive relief or for a period of twelve (12) months from April 4, 2025 as provided for in the Letter Agreement, ¶ 9(e), whichever is greater." D.E. 5-14 ¶ A.i. The terms of the Letter Agreement, therefore, extend the "one-year restriction" to April 2026, a year after Appleman's severance payments cease. Letter Agreement ¶ 9(e). Appleman notes that this practically converts the non-compete into a nearly two-year limitation. Opp'n at 25. However, Appleman provides no authority finding a two-year non-compete unreasonable, and courts in this District have upheld them. *See, e.g.*, *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 432 (E.D. Pa. 2017).

The Court also agrees with ADP that the tolling provision is enforceable. Mot. at 36-37. The RCAs state that the restricted time periods

> shall be tolled during any time period that [Appleman is] in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which [Appleman has] continued to violate such protective covenants and a court has declined to enjoin such conduct or [Appleman has] failed to comply with any such injunction.

2014 RCA ¶ 12. If the Court finds that Appleman breached the Agreements or the Letter Agreement, "[a]ny violation of the RCA tolled the time period that the covenants remained in effect." *Kusins*, 460 N.J. Super. at 380.

### c.    *Injury to the public*

"The final *Solari* factor instructs courts to consider the fact that 'enforcement of the restriction should not cause harm to the public.'" *Pittman*, 2019 WL 5304148, at *18 (quoting *The Cmty. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 60 (2005)). Like in *Rafferty*, the Court finds that the public interest "points both ways—towards the employees' ability to use their marketable skills and the employer's interest in protecting its goodwill and client relationships—and is ultimately equivocal." 923 F.3d at 127. Therefore, on balance, the Court finds that the RCAs are likely enforceable.

Lastly, the Court notes that Appleman does not dispute the enforceability of the non-disclosure provisions of the RCAs, only the non-compete provisions. Opp'n at 19-29. Appleman objects to ADP's accusations that she will improperly use information learned of during her employment to the competitive advantage of CoAdvantage but she does not actually contest the enforceability of any non-disclosure obligation. *Id.* at 22-23. For the avoidance of doubt, the Court holds that the non-disclosure provisions of the RCAs are also likely enforceable. These provisions state: "after the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not disclose, use, reproduce, distribute, or otherwise disseminate ADP's Confidential Information or trade secrets or take any action causing, or fail to take any action necessary, in order to prevent any such information to lose its character or cease to qualify as Confidential Information or a trade secret." 2014 RCA ¶ 6; 2023 RCA ¶ 9. However, as explained *infra*, the Court need not analyze a potential violation of the NDA.

2.      *Breach Claim*

Having established that the RCAs are enforceable, the Court must next determine whether Appleman likely breached the non-compete terms of the RCAs (and therefore, the Letter Agreement). Whether Appleman is in breach turns on her previous position's substantial similarity to the position she now holds at CoAdvantage, whether she will disclose or disseminate "Confidential Information" or trade secrets, and whether CoAdvantage qualifies as a "Competing Business" as defined under the RCAs.

a.      ***CoAdvantage is a "Competing Business"***

The Court finds that CoAdvantage likely qualifies as a "Competing Business" because CoAdvantage competes with ADP's product, TotalSource. ADP TotalSource is a professional employer organization ("PEO"). D.E. 5-5 at 10. CoAdvantage is also a PEO and specializes in human resources and "operates as an outsourcing partner to administer payroll, benefits, workers' compensation and core HR functions." Michaud Decl. ¶ 14; *see also* D.E. 5-5 at 10. ADP TotalSource "deliver[s] the same product" as CoAdvantage because both companies "handle payroll and paychecks, pay taxes to the IRS and handle 401k plans." Appleman Decl. ¶ 21. CoAdvantage and ADP have also directly competed over 690 times in the preceding eighteen months.[7] D.E. 26-5 ("Usberti Decl.") ¶ 3.

Appleman attempts to distinguish CoAdvantage from ADP by arguing it "operates in a fundamentally different market segment" and serves only 4,500 clients, nearly half in Florida, while ADP serves over one million clients globally. Opp'n at 15. "However, the Appellate Division has rejected the relevance of this datapoint, noting a lack of 'any rationale in the record to blue-pencil a market segment component into the RCA . . . . The customer relationships ADP

---

[7] Greg Usberti's Declaration is dated to January 29, 2025. Usberti Decl. at 2.

seeks to protect are the same, regardless of how many employees the client might have.'" *Pittman*, 2019 WL 5304148, at *17 (quoting *Kusins*, 460 N.J. Super. at 407).

### b.  *Appleman is likely not providing the same or substantially similar services*

The Court finds that ADP has not shown that Appleman is likely providing the same or substantially similar services to CoAdvantage that she provided to ADP.  There is concededly some overlap between her previous job responsibilities at ADP and her current job responsibilities at CoAdvantage, but ADP has not shown where exactly the overlap lies, nor whether the overlap is meaningful.

As Senior Vice President of Health, Wealth, Tax & Compliance,[8] Appleman oversaw ADP TotalSource's benefit program.  Supp. Michaud Decl. ¶ 12.  She managed the service teams that handled day-to-day client support by answering questions about insurance, contributions, group assignments, available benefits, and compliance.  Appleman Decl. ¶ 12.  Appleman also oversaw the teams interfacing with insurance carriers, brokers, and retirement services, as well as teams handling tax services, business planning, broker relationships, and loan administration during the COVID-19 pandemic.[9]  *Id.* ¶¶ 12-13.

At all times, however, Appleman remained constrained within the ADP hierarchy. Appleman regularly had to await multiple layers of review and approval before taking action.  *Id.* ¶ 15.  For example, Appleman could not, on her own, hire and fire, award merit or special bonuses, set prices on product offerings, set revenue goals, or execute contracts.  *Id.* ¶¶ 15-16.  She had no book of business, rarely interacted with clients, had limited ability to make decisions regarding

---

[8] Appleman remained in this role until July 2023, when she was promoted to ADP TotalSource Senior Vice President/General Manager.  Appleman Decl. ¶ 14.
[9] ADP does not argue that loan administration is a job responsibility that Appleman still has at CoAdvantage.

clients, was not responsible for meeting sales quotas, revenue targets, and did not participate in strategic development, pricing decisions, healthcare underwriting, product development or presentations, policy decisions, or internal human resource functions. *Id.* ¶ 18.

In contrast, as COO of CoAdvantage, Appleman is not so constrained. She reports only to the Chief Executive Officer of CoAdvantage. Cumbee Decl. ¶ 20. She has authority over employee hiring, pay, account management, and allocation of CoAdvantage's resources. *Id.* ¶¶ 18, 20. She leads CoAdvantage's internal human resources team. Appleman Decl. ¶ 54. Although Appleman is not client-facing and does not engage with soliciting clients, *id.* ¶ 60, she is involved in the client onboarding process and in their day-to-day management, Cumbee Decl. ¶¶ 18-19. Appleman also plays a "critical role" in developing CoAdvantage's company strategy. *Id.* ¶ 20. Moreover, the technology that CoAdvantage offers is distinct from what ADP offers. *Id.* ¶¶ 26, 31. To the extent that Appleman's operations-focused responsibilities overlap in kind with what she did at ADP, they appear to differ in nature because CoAdvantage uses a "completely different technology platform" that requires a distinct operational approach. *Id.* ¶ 31. ADP does not dispute that the technological nature of its services differs from CoAdvantage's.

In sum, the parties identify which roles Appleman had and which roles Appleman did not have at ADP. ADP, however, stops short of meeting its burden because it does not show how Appleman's roles at CoAdvantage are the "same or substantially similar" to Appleman's old roles at ADP. ADP merely—in conclusory fashion—states that they are. *See, e.g.*, Mot. at 25 ("Appleman took a substantially similar position at CoAdvantage after her separation of employment from ADP." (citing Michaud Decl. ¶¶ 16-17)). The evidence ADP relies on is similarly conclusory. *See, e.g.*, Michaud Decl. ¶ 16 ("Appleman's role as Senior Vice President of Service at CoAdvantage is virtually identical to the role she held as ADP Total Source's

SVP/GM."); *id.* ¶ 17 ("Appleman's role at ADP's direct competitor in a substantially similar position to that which she held at ADP works to ADP's competitive disadvantage and to Appleman and CoAdvantage's unfair advantage.").

ADP may be able to show after discovery that Appleman's services at CoAdvantage are indeed the same or substantially similar to the services she provided to ADP, but on this record, it has not done so.

c.    ***ADP has not shown that Appleman will disclose or disseminate ADP's "Confidential Information"***

The Court also finds that ADP has not shown that Appleman is likely in possession of "Confidential Information,"[10] or that she is likely to disclose or disseminate such information. ADP is concerned that Appleman "is sure to use, disclose or disseminate ADP's Confidential Information that she impermissibly sent between her personal email address and her ADP email address." Mot. at 26. In response, Appleman has certified that she deleted those emails while at ADP, that she is not in possession of any confidential information or trade secrets, and that she did not (and would not) use or disseminate ADP's "Confidential Information" or trade secrets. Appleman Decl. ¶¶ 29-34. ADP has not pointed to any other type of "Confidential Information" or trade secrets of which Appleman is in possession of. *Id.* In any event, ADP has not pointed to any evidence that despite Appleman's certification, she is nevertheless sure to disclose or disseminate such information anyway. Mot. at 26 (citing D.E. 5-3 ¶ 32); D.E. 5-3 ¶ 32 (citing only the emails that Appleman certifies she deleted); *see also* D.E. 5-3 ¶ 31 ("Upon information and belief, Appleman continues to have access to ADP files, emails, and documents containing ADP confidential and proprietary business information.").

_____

[10] The RCAs also prohibit Appleman from disclosing or disseminating trade secrets, but ADP does not argue that Appleman possesses any. *See* 2014 RCA ¶ 3; 2023 RCA ¶ 5.

At this juncture, ADP has therefore failed to show that Appleman is likely in breach of the RCAs.

**B.        Irreparable Harm**

"A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990) (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 225 (3d Cir. 1987)).  The harm alleged cannot be compensable by legal or equitable remedies.  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989).  Courts routinely recognize that the violation of a non-compete may result in injury that is not "readily ascertained, and as such, does not lend itself to a straightforward calculation of money damages."  *Pittman*, 2019 WL 5304148, at *18 (quoting *Fluorarnics, Inc. v. Trueba*, No. 408-05, 2005 WL 3455185, at *8 (N.J. Super. Ct. Ch. Div. Dec. 16, 2005)).

The non-compete provisions of ADP's RCAs have regularly supported findings of irreparable harm in this District and in New Jersey.  *Olson*, 2020 WL 6305554, at *12 ("The ADP RCA agreement does not come to this Court as a matter of first impression. . . . ADP's RCA agreement serves a legitimate business interest under New Jersey law because it serves ADP's legitimate interest of protecting its client relationships against former employees.").  *See supra* Section III.A.1.a.  As explained in Section III.A.1.a, ADP is entitled to the preservation of its client relationships and the goodwill it has worked to build.

Those cases, however, have generally found irreparable harm based upon the relocation of high performing sales employees to other competitors.  *See, e.g.*, *Pittman*, 2019 WL 5304148, at *1, 18 (finding irreparable harm in part because defendant previously worked in the sales department of ADP and then went to go work for the sales department of a competitor); *ADP, LLC v. Jacobs*, No. 15-3710, 2015 WL 4670805, at *7 (D.N.J. Aug. 5, 2015) (finding irreparable harm

because defendant directly contacted ADP clients that he learned of while working at ADP).  Here, however, Appleman did not meaningfully interact with ADP's clients during her tenure there. Appleman Decl. ¶ 17.  She does not solicit clients at CoAdvantage and is not involved with that process.  *Id.* ¶ 60.

ADP's irreparable harm argument, however, is not predicated on Appleman's interaction with clients while at CoAdvantage.  ADP's argument is predicated on its concern that Appleman may use confidential ADP information.  Mot. at 33-35.  But to prevail, ADP must show that Appleman is in possession of such information and that Appleman will use it to ADP's disadvantage.  *See, e.g.*, *GEODIS USA, LLC v. Bravi*, No. 23-4322, 2023 WL 7221372, at *3-4 (D.N.J. Nov. 2, 2023) (finding no irreparable harm because plaintiff failed to show who was in possession of the confidential information and failed to show that possession of it would cause plaintiff irreparable harm).

ADP, however, does not demonstrate that Appleman is using any "Confidential Information" at CoAdvantage or that she is in possession of it.  ADP points to a few emails containing notes from meetings at ADP that Appleman sent from her personal email to her work email at ADP containing various attachments, D.E. 5-6 ¶¶ 5-7, but Appleman certifies that she does not possess those emails and deleted them while at ADP, *see* Appleman Decl. ¶¶ 29-30. Appleman explains that while at ADP, she regularly deleted notes from her phone and email account and regularly shredded any physical copies of notes as well.  Appleman Decl. ¶¶ 29-30. Appleman further certifies that she does not possess ADP products, software, client lists, prospective client lists, ADP client contracts, or *any ADP documents* at all.  *Id.* ¶¶ 32-33.  She also certifies that not only has she never (and would never) share any ADP confidential information,

but she has also not attempted to and will not attempt to solicit ADP clients. *Id.* ¶¶ 33-34. In fact, Appleman certifies that she has referred ADP prospects *back to ADP*. *Id.*

While discovery may prove otherwise, ADP has not definitively shown on this record that Appleman is in possession of confidential or proprietary information, or trade secrets or that she is likely to disclose or disseminate such information.

### C.    Balance of Hardships

"Before granting an injunction, a district court must balance the relative harm to the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). ADP must therefore also show that "granting relief will not result in even greater harm to the nonmoving party." *Transcontinental Gas Pipe Line Co., LLC v. Pennsylvania Environmental Hearing Bd.*, 108 F.4th 144, 150 (3d Cir. 2024).

Granting ADP's requested relief would mean that Appleman could no longer continue as COO of CoAdvantage. Cumbee Decl. ¶ 27. This would impose significant hardship on both Appleman, Appleman Decl. ¶ 64, and on CoAdvantage which would be forced to restart the recruitment and hiring process in search of another COO candidate with the requisite level of experience with the industry (which Appleman possessed beyond just her experience at ADP), Cumbee Decl. ¶ 29. *C.f. Rafferty*, 923 F.3d at 119 n.5 (finding "the balance of the interests tipped towards ADP because Rafferty would not be required to quit her job"). The denial of injunctive relief, however, would not impose as great an impact on ADP. Although ADP technically competes with CoAdvantage, it does so infrequently and operates at a level that is a fraction of

ADP's size.  Cumbee Decl. ¶ 23. Therefore, the balance of harms favors allowing Appleman to maintain her employment with CoAdvantage.

###### D.    Public Interest

The Court must also consider a potential preliminary injunction's effect on the public interest.  *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 191-92 (3d Cir. 1990).  There is generally a strong public interest in upholding contractual agreements, *Cabela's LLC v. Highby*, 362 F. Supp. 3d 208, 225 (D. Del. 2019), including non-compete agreements to protect legitimate business interests, *Jacobs*, 2015 WL 4670805, at \*8.  However, the public interest also favors competition and an employee's right to work for whom they please.  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010).

Here, ADP has not shown a likelihood that Appleman is in breach of the RCAs, there is no apparent need to enforce the agreements.  There is therefore no legitimate business need that appears to warrant issuance of injunctive relief.

## IV.    CONCLUSION

For the reasons stated above, the Court will **DENY** ADP's Motion for Preliminary Injunction.  An appropriate Order accompanies this Opinion.

Dated: August 14, 2025

_____
Evelyn Padin, U.S.D.J.